UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x
NICOLE PHILLIPS, Administrator of the Estate of RICHARD
G. DINNENY, deceased,

                         Plaintiff,

                  - against -

THE CITY OF MIDDLETOWN, a municipal corporation,
MIDDLETOWN POLICE CHIEF RAMON BETHENCOURT,
in his official & individual capacity, THE CITY OF
MIDDLETOWN POLICE DEPARTMENT, MIDDLETOWN
POLICE OFFICER GEORGE NEILSON No. 1152, in his
official & individual capacity, MIDDLETOWN POLICE
OFFICER JASON BERMAN No. 1179, in his official &
individual capacity, MIDDLETOWN POLICE SERGEANT
DAVID FRANCK, in his official & individual capacity, and
MIDDLETOWN POLICE OFFICER JORDAN McINERNEY,
in his official & individual capacity,

                         Defendants.
-----------------------------------------------------------------------------x

**OPINION AND ORDER**

No. 17-CV-5307 (CS)

<u>Appearances</u>:

Michael D. Meth
Meth Law Offices, P.C.
Chester, New York
*Counsel for Plaintiff*

Alex Smith
Middletown, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

          Before the Court is the motion to dismiss of Defendants City of Middletown (the "City"),

Middletown Police Department (the "MPD"), Police Chief Ramon Bethencourt, Police Officer

George Neilson, Police Officer Jason Berman, Police Sergeant David Franck, and Police Officer

Jordan McInerney. (Doc. 39.)[1] For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

I accept as true the facts, but not the conclusions, set forth in the Amended Complaint. (Doc. 30 ("AC").)

### A.    The Incident

On July 13, 2016 at about 6:50 p.m., Richard Dinneny called 911 from his girlfriend's home (the "Home"). (AC ¶¶ 15, 48-49.) Dinneny told Lieutenant Booth that he was upset, intoxicated and armed. (*Id.* ¶ 49.) He said he was going through withdrawal from heroin and pills, wanted to die and was "ready to put a fucking bullet in [his] head." (*Id.* ¶¶ 28-29, 49.) Dinneny also said that he would shoot his girlfriend and any officers that came to the residence. (*Id.* ¶¶ 49-50.)

Dinneny had a history of mental illness and substance abuse, and had expressed suicidal ideations before – all of which the MPD allegedly knew prior to the 911 call. (*See id.* ¶¶ 3, 48.) On July 8, 2016, the MPD had received a call from an employee at the hospital at which Dinneny had previously received treatment. (*Id.* ¶ 34.) The employee said that she had received a call from Dinneny and was concerned due to Dinneny's history of depression and alcoholism. (*Id.*)

In response to Dinneny's 911 call on July 13, Defendants Neilson, Berman, Franck, and McInerney went to the Home. (*Id.* ¶ 48.) It is unclear whether the information from the hospital employee's call or the information received by Booth from Dinneny's 911 call was forwarded to the Responding Officers, (*id.* ¶ 35), although common sense suggests that at least some

---

[1] The Court refers to the City and the MPD collectively as the "Municipal Defendants" and Neilson, Berman, Franck, and McInerney collectively as the "Responding Officers."

information was shared with the Responding Officers as to the nature of the situation. Franck and McInerney positioned themselves at the front door while Berman was behind them, approximately twelve to fifteen feet from the entrance. (*Id.* ¶ 52.) Neilson later joined the group and positioned himself next to Berman, with his taser drawn. (*Id.* ¶ 53.)

While the Responding Officers were positioning themselves outside, Booth was on the phone attempting to de-escalate the situation. (*Id.* ¶ 54.) Dinneny purportedly complied with Booth's request to put down his weapon, (*id.* ¶ 45), but this information was not relayed to the officers outside, (*id.* ¶ 46). At some point, Franck banged on the door and announced the police presence, unaware that Booth was on the phone with Dinneny. (*Id.* ¶ 54.) As the door opened, Franck forced it inward and observed Dinneny standing in the doorway, holding a cordless telephone and what appeared to be a black handgun. (*Id.* ¶ 55.) He held the weapon, which turned out to be a pellet gun, at his side. (*Id.* ¶¶ 55-56.) Upon seeing the gun, the officers stepped back to seek cover and ordered Dinneny to put the gun down. (*Id.* ¶ 57.) He responded, "I don't give a fuck, shoot me." (*Id.*) He then stepped back into the apartment out of view of the officers. (*Id.* ¶ 58.) When he emerged, he began to raise his right hand. (*Id.*) Upon seeing this movement, the officers fired their weapons multiple times, striking Dinneny an unspecified number of times. (*See id.* ¶¶ 58-59.) Dinneny was pronounced dead at the hospital at 7:51 p.m., about one hour after the officers' arrival at the Home (*Id.* ¶¶ 27, 62-63.)

**B.      Procedural History**

On July 13, 2017, Plaintiff Nicole Phillips, Dinneny's surviving daughter, (*id.* ¶ 15), commenced the instant suit pursuant to 42 U.S.C. § 1983, asserting claims under the Fourth, Eighth, and Fourteenth Amendments, as well as *Monell* claims and claims sounding in supervisory liability, intentional infliction of emotional distress ("IIED"), negligence, assault,

battery, wrongful death, and conscious pain and suffering.  (Doc. 1 ("Complaint") ¶¶ 52-81.)  In

a letter dated August 21, 2017, Defendants requested a pre-motion conference concerning their

proposed motion to dismiss.  (Doc. 25.)  On September 15, 2017, this Court held the pre-motion

conference and gave Plaintiff leave to amend.  (Minute Entry dated Sept. 15, 2017.)  On October

17, 2017, Plaintiff filed the Amended Complaint, (Doc. 30), advancing the same claims asserted

in the original complaint.  Defendant moved to dismiss the Amended Complaint on March 5,

2018.  (Doc. 39.)

## II.     LEGAL STANDARDS

### A.     Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks

omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure

from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of

discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the

court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not

entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

### B. Qualified Immunity

Qualified immunity shields a government official from liability for civil damages if either (1) the "official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (*per curiam*)); or (2) "it was objectively reasonable for [the official] to believe that [his or her] actions were lawful at the time of the challenged act," *Simpson v. City of N.Y.*, 793 F.3d 259, 268 (2d Cir. 2015). "The objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (internal quotation marks omitted). "The objective element of this test requires the court to look beyond the generalized constitutional protection, such as the right to be free of unreasonable searches and seizures, and to determine whether the law is clearly established in a more particularized sense," given the specific factual situation with which the officer is confronted. *Kerman v. City of N.Y.*, 261 F.3d 229, 236 (2d Cir. 2001).

Qualified immunity entitles public officials to "an immunity from suit rather than a mere defense to liability . . . . [I]t is effectively lost if a case is erroneously permitted to go to trial."

*Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis omitted).  The Supreme Court

"repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible

stage in litigation."  *Pearson v. Callahan,* 555 U.S. 223, 232 (2009) (internal quotation marks

omitted).  Indeed, the "driving force" behind the qualified immunity doctrine is the need "to

ensure that insubstantial claims against government officials will be resolved prior to discovery."

*Id*. at 231 (alteration and internal quotation marks omitted).  But qualified immunity motions

often fail at the motion to dismiss stage because the facts in the plaintiff's complaint do not

suffice to make out the defense.  *See Ruffin v. Travers-Marsh*, No. 17-CV-2564, 2018 WL

3368726, at *7 (S.D.N.Y. July 10, 2018) (collecting cases); *Middleton v. City of N.Y.*, No. 04-

CV-1304, 2006 WL 1720400, at *12 (E.D.N.Y. June 19, 2006) (same).

## III.  <u>DISCUSSION</u>

### A.    **Federal Claims Against Neilson, Berman, Franck, and McInerney**

#### 1.    <u>Fourth Amendment – Excessive Force</u>

Plaintiff asserts a Fourth Amendment excessive force claim, as well as an Eighth

Amendment cruel and unusual punishment claim and a Fourteenth Amendment substantive due

process claim, based on the Responding Officers' alleged use of excessive force.  (AC ¶¶ 75-76;

Doc. 38 ("P's Opp.") at 8-9.)  "*[A]ll* claims that law enforcement officers have used excessive

force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free

citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."

*Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original).  Eighth Amendment claims

"are normally limited to post-conviction situations, such as an inmate alleging that excessive

force was used by corrections officers while the inmate was incarcerated serving a prison

sentence."  *Samuels v. Schultz*, No. 11-CV-6255, 2017 WL 1194376, at *4 (W.D.N.Y. Mar. 30,

2017) (citing *Whitley v. Albers*, 475 U.S. 312, 318 (1986)); *see Brown v. City of N.Y.*, 798 F.3d

94, 101 n.10 (2d Cir. 2015) ("[A] claimed Fourth Amendment violation for using excessive force

while making an arrest differs from a claimed Eighth Amendment violation for abusing a

prisoner."). Plaintiff claims that officers used excessive force during a home visit responding to

a 911 call rather in than a post-conviction situation; thus, the Court dismisses Plaintiff's Eighth

Amendment claim. And her substantive due process claim is dismissed because "the Fourth

Amendment provides a more 'explicit textual source of constitutional protection.'" *Russo v. City*

*of Bridgeport*, 479 F.3d 196, 209 (2d Cir. 2007) (quoting *Graham*, 490 U.S. at 395).

Defendants seek dismissal on one of two grounds: (1) the Responding Officers' use of

deadly force was not excessive because Dinneny posed a significant threat; or (2) the

Responding Officers are entitled to qualified immunity. (Doc. 40 ("Ds' Mem.) at 1-9.) Plaintiff

disagrees, arguing that the Responding Officers' actions were not objectively reasonable because

they failed to attempt other interventions before approaching the front door and mistakenly

treated Dinneny as a threat. (P's Opp. at 2-5.)

"A determination of reasonableness under the Fourth Amendment requires a careful

balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

interests against the countervailing governmental interests at stake." *Kerman*, 261 F.3d at 239

(internal quotation marks omitted). Evaluation "of a particular use of force must be . . . from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Graham*, 490 U.S. at 396; *see Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). "A claim [of]

excessive force . . . is subject to an objective test of reasonableness under the totality of the

circumstances, which requires consideration of the specific facts in each case, including . . .

whether the suspect posed an immediate threat to the safety of others and whether he is actively

resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "When courts grant motions to dismiss an excessive force claim, it is because the force used was objectively reasonable as a matter of law." *Wilson v. Boulay*, No. 17-CV-813, 2018 WL 3596750, at *3 (D. Conn. July 25, 2018). Furthermore, qualified immunity protects officers from the "sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation marks omitted), *overruled in part on other grounds by Pearson*, 555 U.S. 223.

Plaintiff alleges that after Franck forced the door inward, he observed Dinneny standing in the doorway holding a pellet gun (at his side) and a cordless telephone. (AC ¶¶ 55-56.) Upon seeing the gun, the officers stepped back to seek cover and ordered Dinneny to put the gun down. (*Id.* ¶ 57.) Dinneny indicated he wanted the officers to shoot him but then stepped back into the apartment out of view of the officers. (*Id.* ¶ 58.) When he emerged, he began to raise his right hand. (*Id.*) Upon seeing this movement, the officers fired their weapons multiple times, striking Dinneny. (*Id.* ¶¶ 58-59.) Plaintiff does not allege the distance between Dinneny and the officers when the officers shot him or how many rounds they fired.[2]

Assuming the allegations to be true and taking them in the light most favorable to Plaintiff, which I must at the motion to dismiss stage, I am constrained to find that the Amended Complaint states a plausible claim of excessive force against the Responding Officers, albeit

---

[2] While Berman was initially twelve to fifteen feet away from the door, (AC ¶ 52), the officers "stepped back to seek cover" after they observed Dinneny holding a pellet gun, (*id.* ¶ 57). So it is unclear how far the officers were from Dinneny when they shot him.

about as weak a one as I can imagine.  There is no indication (at least based on the Amended Complaint) that Dinneny posed a threat in the moment before the officers shot him.  The Amended Complaint does not allege where Dinneny's gun was located when he raised his right hand, so it is not clear from the face of the Amended Complaint that the gun was in his hand or in close reach (or that the officers reasonably perceived it to be so).  Although the logical inference from the Amended Complaint is that the gun was still in Dinneny's hand when he raised it, I cannot say – taking the allegations in the light most favorable to Plaintiff – that it necessarily was.  Likewise, I am not convinced that reasonable, experienced officers could differ as to the appropriateness of shooting a person that did not have a gun in his hand or in close reach and did not otherwise pose a threat.  *See Thomas*, 165 F.3d at 144 (fact issue as to whether plaintiff posed a threat to officers precluded summary judgment on basis of qualified immunity); *Hemphill v. Schott*, 141 F.3d 412, 417 (2d Cir. 1998) ("That [the officer] may reasonably have suspected [the plaintiff] to be armed would not render shooting him reasonable if, as [the plaintiff] alleges, he stopped and raised his hands in the air when commanded.").  Thus, qualified immunity is not appropriate at this time.

Defendant notes that Plaintiff's original Complaint alleged that when Dinneny emerged from the Home, he "'began to raise his right hand *pointing the pellet gun*.'"  (Ds' Mem. at 4 n.2 (emphasis in original) (quoting Complaint ¶ 38).)  The Amended Complaint, however, omits the phrase "pointing the pellet gun."  (*Id.*; *see* AC ¶ 58.)  The Amended Complaint also omits the allegation that Dinneny "did not drop the pellet gun" after the officers told him to put the gun down.  (*Compare* Complaint ¶ 37, *with* AC ¶¶ 57-58.)  "While courts are free to deny leave to amend a complaint if the proposed amended complaint attempts to omit certain previously-alleged facts without adequate explanation or in bad faith, once an amended pleading is filed, a

court may not import information that was contained in the prior pleading but omitted from the amended pleading." *Kilkenny v. Law Office of Cushner & Garvey, L.L.P.*, No. 08-CV-588, 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012) (citation omitted); *see Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 32 (2d Cir. 2002) ("A statement in a withdrawn complaint that is superseded by an amended complaint without the statement is no longer a conclusive judicial admission."), *overruled on other grounds by Slayton v. Am. Exp. Co.*, 460 F.3d 215 (2d Cir. 2006); *see also In re Enron Corp.*, 370 B.R. 583, 597 (Bankr. S.D.N.Y. 2007) ("[A] court may refuse to allow an amendment where, by omitting allegations from the previously filed complaint, the plaintiff seeks to 'erase' admissions that are contained in it.") (quoting *Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)). *But see Davis v. Williamson*, No. 08-CV-2009, 2009 WL 136815, at *4 n.4 (M.D. Pa. Jan. 20, 2009) (plaintiff is "bound by the admissions made in his original complaint and cannot simply erase th[ose] details by omitting them from his amended complaint").[3] Thus, because Plaintiff has filed the Amended Complaint, the Court will not import information from the original Complaint.[4]

---

[3] While the admissions in the original Complaint may no longer be conclusive judicial admissions, they are nevertheless admissible statements of a party under Federal Rule of Evidence 801(d)(2) and will present a problem for Plaintiff should the case get to a jury.

[4] Because Plaintiff provided no explanation for omitting the allegations discussed above, the Court has no way of knowing whether she "acquire[d] new information through discovery, or [her] own investigation, that fundamentally alter[ed] [her] theory of the case." *Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261, 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011), *aff'd*, 457 F. App'x 40 (2d Cir. 2012) (summary order). The omissions from the Amended Complaint suggest gamesmanship at its worst, considering that (1) the omission occurred after Defendants argued in a pre-motion letter that Plaintiff could not sustain an excessive force claim because Plaintiff alleged that Dinneny "began to raise his right hand pointing the pellet gun," (Doc. 25 at 1-2); and (2) Plaintiff did not explain in her opposition brief why the fact changed (despite Defendants having pointed out the "curious – if not disingenuous – omission," (Ds' Mem. at 4 n.2)). Plaintiff's counsel is reminded that if he is indeed omitting a key piece of undisputed factual information in order to avoid dismissal, he and his client run the risk of being sanctioned for vexatiously multiplying the litigation.

Defendants argue that the omission makes no difference, (Ds' Mem. at 4 n.2), relying on a case where the court observed that even if the individual "was unarmed at the moment he was shot, . . . it [is] not unreasonable for the officers to believe that the individual posed a serious threat of physical harm when he was moving in violation of the officers' orders and *his gun remained in close reach*," *Wood v. Farmington City*, 910 F. Supp. 2d 1315, 1327 (D. Utah 2012) (emphasis added) (alterations and internal quotation marks omitted). As discussed above, it is not clear from the face of the Amended Complaint that the gun was indeed in close reach. Because the location of Dinneny's gun when he emerged from the Home the second time will be highly influential as to whether Plaintiff's excessive force claim succeeds or fails,[5] the Court will permit the claim to go forward.

Plaintiff's two other theories of liability, however, are invalid. Plaintiff attempts to base her excessive force claim on the argument that the way in which the Responding Officers approached Dinneny was unreasonable and reckless. (P's Opp. at 3-4.) It is Plaintiff's position that the officers should have attempted a number of alternative approaches: negotiating with Dinneny, entering through the back of the Home to disarm him, or subduing him with less-than-deadly force. (*Id.* at 3.) And at the very least, she contends, the officers should have communicated with Booth, who was attempting to de-escalate the situation. (*Id.*) But "[t]he reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately

---

[5] If Dinneny was holding the gun, summary judgment for the officers will almost certainly be appropriate. *See Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) ("[A]n officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.") (internal quotation marks omitted); *Diggs v. N.Y. Police Dep't*, No. 04-CV-1849, 2005 WL 3533158, at *4 (E.D.N.Y. Dec. 22, 2005) ("If a suspect threatens an officer with a weapon, the officer may use deadly force in response."); *see also Davidson v. City of Opelika*, 675 F. App'x 955, 959 (11th Cir. 2017) (summary order) (*per curiam*) (on summary judgment, observing that "the unusual position of the dark object in [the plaintiff's] outstretched and clasped hands would have led a reasonable officer to believe that [the plaintiff] was pointing a gun at him"). Likewise, if the officers were unable to see whether Dinneny had dropped the gun before he raised his arm, they in all likelihood will be entitled to qualified immunity.

prior to and at the moment that he made the split-second decision to employ deadly force."

*Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996). Thus, the officers' actions "leading up to the

shooting are irrelevant." *Id.*; *see Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017)

(no constitutional violation where officer rushed toward apartment without backup even though

such action violated department procedures and arguably increased likelihood that he may have

to use force). Furthermore, prior to the shooting, the only other actions that the Responding

Officers took were Franck announcing the police presence and opening the front door. (AC

¶¶ 54-55.) It cannot be said that such action was unreasonable, let alone reckless. And to the

extent the officers violated internal procedures in how they approached Dinneny, violations of

internal procedures do not in themselves rise to the level of a constitutional violation. *See Salim*,

93 F.3d at 92 (declining to find officer liable for excessive force where plaintiff argued that

officer violated multiple internal procedures in moments before using deadly force); *Vazquez v.

City of N.Y.*, No. 10-CV-6277, 2014 WL 4388497, at *13 n.6 (S.D.N.Y. Sept. 5, 2014) ("Section

1983 'protects plaintiffs from constitutional violations, not violations of . . . departmental

regulations and police practices.'") (quoting *Thompson v. City of Chicago*, 472 F.3d 444, 454

(7th Cir. 2006)).

Next, Plaintiff argues that Dinneny was not an immediate threat because he "never

discharged his weapon at [the] officers" and "it was obvious that the gun in [his] possession was

a pellet gun." (*See* P's Opp. at 3-4.) But by Plaintiff's own admission, the pellet gun appeared

to be a handgun. (AC ¶ 55.) Thus, it was objectively reasonable for the Responding Officers to

treat the gun in Plaintiff's hand as if it were a handgun. A reasonable officer is not expected to

be able to tell the difference between a handgun and a pellet gun that appears to be a handgun.

*See Aipperspach v. McInerney*, 963 F. Supp. 2d 901, 904-05, 908 (W.D. Mo. 2013) (on summary

judgment, holding that officers' use of deadly force was objectively reasonable where individual held pellet gun that looked like real gun to officers and finding that video evidence did not controvert testimony of officers who believed individual pointed a real gun), *aff'd*, 766 F.3d 803 (8th Cir. 2014); *see also Ballard v. Burton*, 444 F.3d 391, 403 (5th Cir. 2006) (reasonable officer not expected to know how many rounds had been fired or how many rounds remained in individual's rifle).  And as to Plaintiff's claim that Dinneny was not a threat because he never discharged his weapon at the officers, in a tense and rapidly-evolving situation, like the one alleged here, "[t]here [i]s no reason for [an officer] to have to wait to be shot at or even to see [the individual] raise a gun and point it at [the officer] before it would be reasonable for [the officer] . . . to shoot [the individual]." *Phillips v. James*, 422 F.3d 1075, 1084 (10th Cir. 2005); *see Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often . . . too late to take safety precautions.") (alteration in original) (internal quotation marks omitted); *Estate of Jackson v. City of Rochester*, 705 F. Supp. 779, 784 (W.D.N.Y. 1989) ("The super-cop of television and movies who disarms felons in hand-to-hand combat or with a well-placed shot to the hand should not be the standard by which we determine whether there has been a violation of a citizen's constitutional rights.").

Thus, the excessive force claim will proceed only on the theory that the force was excessive because Dinneny did not have the gun and it was not close by.  If Plaintiff cannot proceed on that theory in good faith, she should withdraw the claim.

2.    <u>Fourteenth Amendment – Equal Protection</u>

Plaintiff contends that Defendants denied Dinneny equal protection of the laws by ignoring established policy and protocol and using deadly force despite having knowledge of Dinneny's history of mental illness.  (P's Opp. at 9-10.)

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To establish an equal protection claim, a plaintiff "must show both that he was treated differently than other persons who were similarly situated and that such differential treatment was either without rational basis (a 'class of one' claim) or was motivated by an intent to discriminate on an impermissible basis (a selective enforcement claim)."  *Casciani v. Nesbitt*, 392 F. App'x 887, 888 (2d Cir. 2010) (summary order) (citing *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (describing elements of class of one claim), and *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995) (describing elements of selective enforcement claim)).  For an individual to be "similarly situated," he "must be, at a minimum, similarly situated in all material respects."  *Sharpe v. City of N.Y.*, No. 11-CV-5494, 2013 WL 2356063, at *4 (E.D.N.Y. May 29, 2013) (internal quotation marks omitted), *aff'd*, 560 F. App'x 78 (2d Cir. 2014) (summary order).  "Conclusory allegations of selective treatment are insufficient to state an equal protection claim."  *Jarrach v. Sanger*, No. 08-CV-2807, 2010 WL 2400110, at *8 (E.D.N.Y. June 9, 2010); *see Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008) ("Conclusory allegations of disparate treatment or plaintiff's personal belief of discriminatory intent is insufficient.") (internal quotation marks omitted).

In light of Plaintiff's argument that Dinneny was denied his right of equal protection because of his disability, (*see* P's Opp. at 8-10), the Court will apply the class of one framework.

*See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 109 (2d Cir. 2001) ("Where disability discrimination is at issue, the Fourteenth Amendment only proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose."); *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 236 (E.D.N.Y. 2015) (applying class-of-one framework to equal protection claim based on disability discrimination); *Peterson v. New York*, No. 06-CV-3369, 2009 WL 935669, at *20 (S.D.N.Y. Apr. 7, 2009) ("The Supreme Court has expressly held . . . that cases involving mental illness . . . do not involve [a] quasi-suspect class[] and, consequently, do not warrant anything more onerous than rational basis review.").

"[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (alteration in original) (internal quotation marks omitted). "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Id.* at 59-60.

Plaintiff provides no facts whatsoever comparing how Dinneny was treated to the treatment of similarly situated individuals who are not mentally ill. *See, e.g.*, *Eskenazi-McGibney*, 84 F. Supp. 3d at 237 (dismissing equal protection claim where plaintiff failed to point to any similarly-situated individuals who were treated differently); *MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010) (dismissing equal protection claim –

"whether pled as a selective enforcement claim or a class-of-one claim" – where complaint did not "identify any comparators or similarly situated entities at all").  Furthermore, Plaintiff alleges no facts establishing that the Responding Officers were even aware of Dinneny's mental illness.  Plaintiff does not know whether the officers were privy to the details of the phone call from the hospital employee and it is unclear what the officers knew from Dinneny's 911 call. (AC ¶ 35.)  But assuming they were aware of Dinneny's mental illness, Plaintiff's allegation that the officers mistreated Dinneny because of his mental illness is conclusory.  *See Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 439 (2d Cir. 2009) (dismissing equal protection claim on summary judgment where plaintiff failed "to show that it was her gender, and not some other characteristic, that motivated the treatment she received"); *Butler v. City of Batavia*, 323 F. App'x 21, 22 (2d Cir. 2009) (summary order) (dismissing equal protection claim where plaintiffs failed to plead facts sufficient to make allegation that defendants conduct was motivated by plaintiffs' sexual orientation).[6]  Accordingly, Plaintiff's equal protection claim is dismissed.

### B.      Federal Claims against Bethencourt

Plaintiff asserts a supervisory liability claim against Bethencourt.  Supervisory liability is not a claim in itself, but rather a theory under which a supervisor can be liable under § 1983 for the constitutional violations of her subordinates.  *See Emanuel v. Griffin*, No. 13-CV-1806, 2015 WL 1379007, at *15 (S.D.N.Y. Mar. 25, 2015); *Clarke v. Sweeney*, 312 F. Supp. 2d 277, 296-97 (D. Conn. 2004).  Plaintiff alleges that because Bethencourt was responsible for training the

---

[6] Plaintiff really seems to be arguing that Dinneny should have received more favorable treatment than similarly situated people who are not mentally ill.  But that is not the stuff of an equal protection violation.  Such a claim requires her to show that Dinneny was treated less favorably than such people.  *See Ruston*, 610 F.3d at 59-60 (affirming dismissal of equal protection claim where plaintiffs failed to allege that similarly situated comparators were treated more favorably).

Responding Officers, he is responsible for their deprivation of Dinneny's constitutional rights. (AC ¶¶ 83-84.) Defendants argue that this claim should be dismissed because there is no underlying deprivation of rights. (Ds' Mem. at 16.) Having already decided that Plaintiff has stated an excessive force claim, Defendants' argument fails.

Nonetheless, Plaintiff has not plausibly pleaded that Bethencourt is liable as a supervisor. To establish § 1983 liability, the plaintiff must show the defendant's personal involvement in the alleged constitutional violation. *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal quotation marks omitted). Under *Colon v. Coughlin*, the personal involvement of a supervisor may be shown in one of five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d 865, 873 (2d Cir. 1995).[7] Plaintiff has not pleaded facts plausibly suggesting any of those things. To the extent she intended to plead the fourth type of liability, she has failed, because she asserts essentially no facts. *See Jackson v. Williams*, No. 16-CV-1137, 2017 WL

---

[7] Although the Second Circuit has yet to speak definitively, there is a strong argument that after *Iqbal*, 556 U.S. at 677, supervisory liability may be predicated only on direct involvement in the constitutional violation or creation of a policy that sanctioned it. *See, e.g.*, *Bellamy v. Mount Vernon Hosp.*, No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (other theories "impose the exact types of supervisory liability that *Iqbal* eliminated – situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate"), *aff'd*, 387 F. App'x 55 (2d Cir. 2010) (summary order); *see also Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (expressing "considerable skepticism" that, post-*Iqbal*, supervisor could be held liable for anything other than his own individual actions); *Taylor v. City of N.Y.*, No. 16-CV-7857, 2018 WL 1737626, at *8 n.8 (S.D.N.Y. Mar. 27, 2018) (collecting cases).

1162196, at *4 (N.D.N.Y. Mar. 28, 2017) (supervisory liability premised on grossly negligent training "cannot rest on mere boilerplate allegations") (collecting cases); *Ryan v. Moss*, No. 11-CV-6015, 2013 WL 956722, at *17 (W.D.N.Y. Mar. 12, 2013) (conclusory allegations regarding training are insufficient for supervisory liability) (collecting cases); *Gray-Davis v. New York*, No. 14-CV-1490, 2015 WL 2120518, at *8 (N.D.N.Y. May 5, 2015) ("Vague and conclusory claims that a supervisory official has failed to provide proper training and supervision or created a specific policy, without facts showing personal involvement, are legally insufficient to state a claim . . . ."). Accordingly, the supervisory liability claim against Bethencourt is dismissed.

### C. Federal Claims Against Municipal Defendants

Plaintiff asserts a municipal liability claim against the Municipal Defendants under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). (AC ¶¶ 77-81.) As a threshold matter, the claim against the MPD is dismissed because a local police department "is considered an administrative arm of the [municipality], without a legal identity separate and apart from the municipality and, therefore, without the capacity to sue or be sued." *Aguilera v. Cty. of Nassau*, 425 F. Supp. 2d 320, 323 (E.D.N.Y. 2006) (collecting cases).

"To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (alteration and internal quotation marks omitted). To allege such a policy or custom, the plaintiff may assert:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to

"deliberate indifference" to the rights of those who come in contact with the municipal employees.

*Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014). "[M]ere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015).

Plaintiff offers only a conclusory allegation of a failure to train amounting to deliberate indifference. (*See* AC ¶ 80 ("[U]pon information and belief, the City . . . did not provide adequate training to police officers on the proper interaction with people with mental illnesses.") (emphasis omitted).)[8] She provides no facts rendering this conclusion plausible. "While a court may not apply a heightened pleading standard to *Monell* claims, 'boilerplate' conclusions as to municipal liability will not suffice, even at this early stage of the litigation." *Betts*, 2013 WL 311124, at *15 (citation omitted). Plaintiff has not alleged any nonconclusory facts about the municipal defendant at all. *See Zahra*, 48 F.3d at 685 ("[T]he mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.") (second alteration in original) (internal quotation marks omitted); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *6 (N.D.N.Y. Nov. 26, 2014) (municipal liability insufficiently pleaded

---

[8] Plaintiff also claims that the "failure to train was a conscious decision by the Police Department," noting that the police, on a prior occasion, "responded to a scene involving an individual with a known history of mental illness and responded with deadly force." (P's Opp. at 11-12.) The Court declines to consider this statement, however, because "the complaint may not be amended by simply raising new facts in opposition to Defendants' motion." *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 363 n.9 (S.D.N.Y. 2011). Moreover, even if this allegation were in the Amended Complaint, absent significantly more factual material, one cannot even infer that that incident involved excessive force, let alone anything about the MPD's training.

where complaint used label "deliberate indifference" and generically referenced failure to train, but did not "allege facts that support either conclusory notion"); *Guerrero v. City of N.Y.*, No. 12-CV-2916, 2013 WL 673872, at *2 (S.D.N.Y. Feb. 25, 2013) ("[B]oilerplate claims do not rise to the level of plausibility required to state a viable *Monell* claim.") (internal quotation marks omitted). Accordingly, Plaintiff's *Monell* claim fails.

### D. State Law Claims

The Amended Complaint includes state law claims for assault, battery, negligence, IIED, wrongful death, and conscious pain and suffering. (AC ¶¶ 86-102.)[9] The assault and battery claims are asserted against the Responding Officers, while the other claims are asserted against all Defendants. The Court dismisses the state law claims against Bethencourt because no personal involvement in these torts on his part is alleged, and against the MPD because it is not a suable entity.

#### 1. Assault and Battery

In New York, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993). A plaintiff asserting a battery claim against a police officer must "prove that [the officer's] conduct was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties." *Nimely v. City of N.Y.*, 414 F.3d 381, 391 (2d Cir. 2005); *see* N.Y. Penal Law § 35.30(1); *Brunelle v. City of N.Y.*, 702 N.Y.S.2d 648, 648-49 (2d Dep't 2000). Thus, with the exception of

---

[9] The paragraph after ¶ 101 is numbered "81." (AC at 19.) The Court assumes this was a word processing error and will treat the paragraph as if it were numbered "102."

the state actor requirement, the elements of a Section 1983 excessive force claim and state law assault and battery claims are substantially identical. *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991). In effect, "the test for whether a plaintiff can maintain [state law assault and battery] cause[s] of action against law enforcement officials is the exact same test as the one used to analyze a Fourth Amendment excessive force claim." *Kavazanjian v. Rice*, No. 03-CV-1923, 2008 WL 5340988, at *7 (E.D.N.Y. Dec. 22, 2008) (alteration and internal quotation marks omitted).

Because the Amended Complaint plausibly alleges that the Responding Officers' conduct constituted excessive force that caused Dinneny's death, the Amended Complaint plausibly alleges state law claims for assault and battery. As a result, the Court will not dismiss those claims.

### 2. Negligence

"[U]nder New York State law, when a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Bogart v. City of N.Y.*, 13-CV-1017, 2016 WL 4939075 at *13 (S.D.N.Y Sept. 6, 2016) (collecting cases); *see Mazurkiewicz v. N.Y.C. Transit Auth.*, 810 F. Supp. 563, 570-71 (S.D.N.Y 1993) ("Plaintiff cannot argue that defendants engaged in intentional conduct that forms the basis of an assault and § 1983 excessive force claim and also argue that defendants were negligent towards plaintiff."). Because Plaintiff brings excessive force, assault, and battery claims premised on the intentional conduct of the Responding Officers, she cannot sustain a negligence claim with respect to the same conduct against those Defendants. Accordingly, Plaintiff's negligence claim is dismissed.

### 3.    Intentional Infliction of Emotional Distress

Under New York Law, a successful IIED claim requires a showing of "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Warr v. Liberatore*, 270 F. Supp. 3d 637, 654 (W.D.N.Y. 2017) (quoting *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). When the conduct complained of falls within the ambit of other traditional tort liability (e.g., assault and/or battery), an IIED claim "is generally unavailable." *Id.* (collecting cases); *see Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (observing that New York Court of Appeals "has questioned whether an intentional infliction claim can ever be brought where the challenged conduct falls well within the ambit of other traditional tort liability" and noting that "[a]ll four Appellate Division courts have answered the question and held that it cannot") (internal quotation marks omitted). In other words, IIED is a tort of "last resort." *Salmon*, 802 F.3d at 256 (internal quotation marks omitted). Because the complained of conduct is actionable under another theory of tort law, the IIED claim is dismissed.

### 4.    Wrongful Death

"Under New York law, to recover damages for wrongful death, a plaintiff must prove: (1) the death of a human being; (2) a wrongful act, neglect or default of the defendant that caused the decedent's death; (3) the survival of distributees who suffered pecuniary loss by reason of the decedent's death; and (4) the appointment of a personal representative of the decedent." *Estate of Jaquez v. City of N.Y.*, 104 F. Supp. 3d 414, 440 (S.D.N.Y. 2015) (internal quotation marks omitted); *see* N.Y. Est. Powers & Trusts Law § 5-4.1. Plaintiff has sufficiently pleaded the first two elements by alleging that a wrongful act caused Dinneny's death. *See Jaquez*, 104 F. Supp.

3d at 440 (observing that wrongful death claim is derivative of assault and battery claims).

Plaintiff has also alleged a pecuniary loss of at least $5,875 in funeral costs. (AC ¶ 102.)

Finally, Plaintiff has sufficiently pleaded that she is the appointed personal representative of

Dinneny's estate. (*Id.* ¶¶ 15-16.) The Court therefore finds that Plaintiff has properly pleaded a

claim for wrongful death. Furthermore, the City is liable as an employer because the

Responding Officers were acting in the performance of their duties and within the scope of their

employment when they shot Dinneny. *See Mosca v. City of N.Y.*, No. 17-CV-4327, 2018 WL

3151704, at *6 (E.D.N.Y. Apr. 24, 2018) ("It is well-established that an employer is vicariously

liable for a tort committed by his servant while acting within the scope of his employment.").

Accordingly, this claim is not dismissed.

### 5. Conscious Pain and Suffering

"To establish a claim for conscious pain and suffering, a plaintiff must prove that the

plaintiff was conscious for some period of time following the accident." *Cruz v. City of New

Rochelle*, No. 13-CV-7432, 2017 WL 1402122, at *29 (S.D.N.Y. Apr. 3, 2017) (internal

quotation marks omitted). The Amended Complaint does not allege that Dinneny was conscious

at any point after the shooting. As a result, Plaintiff has failed to state a claim for conscious pain

and suffering. *See Pub. Adm'r of Queens Cty. ex rel. Estate & Beneficiaries of Guzman v. City

of N.Y.*, No. 06-CV-7099, 2009 WL 498976, at *13 (S.D.N.Y. Feb. 24, 2009) (on summary

judgment, dismissing survival action for conscious pain and suffering where plaintiff made no

showing that decedent was conscious at any point after shooting). The pain and suffering claim

is therefore dismissed.

## IV.  **LEAVE TO AMEND**

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  It is "within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  "Leave to amend, though liberally granted, may properly be denied for:  'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'"  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has amended her complaint once, (Doc. 30), after having the benefit of a pre-motion letter from Defendants outlining their proposed grounds for dismissal, (*see* Doc. 25), and the discussion at the September 25, 2017 pre-motion conference, (Minute Entry dated Sept. 25, 2017).  Plaintiff's failure to fix deficiencies in her previous pleadings, after being provided ample notice of them, is alone sufficient ground to deny leave to amend *sua sponte*.  *See In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted); *see also Payne v. Malemathew*, No.

09-CV-1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*.").

Further, Plaintiff has not asked to amend again or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this opinion. Accordingly, the Court declines to grant leave to amend *sua sponte*. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted).

## V.    <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 39), and terminate the following parties as Defendants: the City of Middletown Police Department and Ramon Bethencourt. The remaining claims are as follows:

- Count I (excessive force) against Neilson, Berman, Franck, and McInerney (under the Fourth Amendment only);

- Count VI (assault) against Neilson, Berman, Franck, and McInerney;

- Count VII (battery) against Neilson, Berman, Franck, and McInerney; and

- Count VIII (wrongful death) against Neilson, Berman, Franck, McInerney, and the City.

The remaining parties are directed to appear before the Court on October 11, 2018 at 3:00 p.m. for a status conference.

**SO ORDERED.**

Dated: September 24, 2018
      White Plains, New York

_____
     CATHY SEIBEL, U.S.D.J.