UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
NICOLE PHILLIPS, Administrator of the Estate of
Richard G. Dinneny, deceased,

                                        Plaintiff,

        - against -

THE CITY OF MIDDLETOWN, a municipal                         **OPINION & ORDER**
corporation, MIDDLETOWN POLICE OFFICER
GEORGE NEILSON No. 1152, in his official                     No. 17-CV-5307 (CS)
capacity & individual capacity, MIDDLETOWN
POLICE OFFICER JASON BERMAN No. 1179,
in his official capacity & individual capacity,
MIDDLETOWN POLICE SERGEANT DAVID
FRANCK, in his official capacity & individual
capacity, and MIDDLETOWN POLICE OFFICER
JORDAN McINERNEY, in his official capacity &
individual capacity,

                                        Defendants.
-----------------------------------------------------------------x

<u>Appearances</u>:

Michael D. Meth
Meth Law Offices, PC
Chester, New York
*Counsel for Plaintiff*

Alex Smith
Corporation Counsel
City of Middletown
Middletown, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is the second motion for summary judgment of Defendants City of

Middletown (the "City"), George Neilson, Jason Berman, David Franck, and Jordan McInerney

(collectively, "Defendants").  (ECF No. 101.)[1]  For the reasons discussed below, Defendants'

motion for summary judgment is GRANTED.

## I.    **BACKGROUND**

This case stems from a tragic incident in which Richard Dinneny, who was in possession

of a pellet gun resembling a handgun, was fatally shot by officers of the Middletown Police

Department.[2]  The following facts are based on the parties' Local Civil Rule 56.1 Statements,

responsive 56.1 Statements,[3] and supporting materials, and are undisputed except as noted.

---

[1] The Court refers to Neilson, Berman, Franck, and McInerney collectively as the "Responding Officers."

[2] Richard Dinneny's last name is spelled inconsistently throughout the record.  The Court uses the spelling that Plaintiff uses in the Amended Complaint and changes any other spellings to conform to it.

[3] Many of Plaintiff's responses to Defendants' 56.1 Statements merely add facts or dispute only a portion of Defendants' statement, which is insufficient to dispute the entirety of that statement.  *See e.g., Johnson v. City of N.Y.*, No. 15-CV-6915, 2019 WL 294796, at 10 n.8 (S.D.N.Y. Jan. 23 2019) ("56.1 statements not explicitly denied by plaintiff are deemed admitted") (cleaned up); *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (improper to "interject[] arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts."); *Clarendon Nat'l Ins. Co. v. Culley*, No. 11-CV-2629, 2012 WL 1453975, at *2 & n.3 (S.D.N.Y. Apr. 25, 2012) (finding fact undisputed where Plaintiff only disputed a portion of a paragraph).  Accordingly, any of Defendants' 56.1 Statements, or any portion thereof, that are properly supported and that Plaintiff does not specifically deny with evidence are deemed admitted for purposes of this motion.  *See Universal Calvary Church v. City of N.Y.*, No. 96-CV-4606, 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000).  Additionally, Plaintiff's responsive 56.1 Statement includes additional facts that she contends are undisputed.  (ECF No. 116 ("P's 56.1 Resp.") at 19-24.) But such a statement is not permitted under Local Rule 56.1.  That Rule allows for a counterstatement of "additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment thinks are important or helpful; any additional facts should be confined to material facts in dispute.  I have nevertheless considered Plaintiff's additional facts and Defendants' responses thereto, (ECF No. 110).

A.    **Facts**

On July 13, 2016 at around 6:50 p.m., Dinneny called 911 from his girlfriend's residence at 109 Overlook Drive, in Middletown, New York (the "Home").  (P's 56.1 Resp. ¶¶ 1, 3, 23.) Dinneny spoke with Lieutenant George Booth, stating "that he was upset, intoxicated, and armed with a weapon," that he wanted to die, and "that he would shoot his girlfriend and any officers that came to the residence."  (*Id.* ¶¶ 1, 44.)  The 911 dispatcher radioed that there was a violent domestic incident in progress at the Home, with a male subject threatening to shoot a female with a firearm, and that the subject was on the phone with the police department.  (*Id.* ¶ 3.)[4]

Defendants Berman, Franck, and McInerney responded to the Home and approached the front door.  (*Id.* ¶¶ 4, 23, 30.)  Defendant Franck knocked repeatedly on the door, identifying the officers as Middletown Police, and directing the door to be opened.  (*Id.* ¶¶ 4, 24, 30.)  The sequence of events regarding who opened the door, how, and when, is immaterial, (*see id.* ¶¶ 5, 25, 31), but eventually the door was opened and the officers "observed Dinneny standing in the doorway holding what appeared to be a black hand gun in his right hand facing the ground, and a wireless house phone in his left hand," (*id.* ¶ 6).  Defendant Franck pointed his firearm at Dinneny and repeatedly told him to drop his gun.  (*Id.*)  Dinneny yelled, "No, no" and "shoot me."  (*Id.*)  By this time, Neilson had arrived on the scene.  (*Id.* ¶ 7.)

Dinneny went back into the Home, but reappeared approximately thirty seconds later. (*Id.* ¶¶ 7, 9.)  Dinneny walked towards the door with the firearm, which turned out to be a pellet gun, in his right hand, facing down.  (*Id.* ¶ 9; *see id.* ¶ 40.)  Multiple officers yelled to Dinneny to drop the gun, (*id.* ¶¶ 9, 11-12, 26, 33), and according to Berman, Dinneny "'said the same type of

---

[4] Counsel for Defendants submitted, and the Court considered, a CD-ROM containing the recording of the radio call between the dispatcher and the officers.

effect as he did prior, you know, shoot me, kill me, things of that nature,'" (*id.* ¶ 9 (quoting ECF No. 117-4 at 45:21-24).)  Defendant Berman also testified that he "'heard Sergeant Franck actually say [shots] will be fired because we weren't having any compliance.  And then at about that same time the firearm started to move with his right hand from behind his thigh or next to his thigh up through a 45, 50-degree angle towards me where I was and at that time I fired rounds from my patrol rifle.'"  (*Id.* ¶¶ 9, 14 (quoting ECF No. 117-4 at 45:24-46:7).)  Franck had taken cover and lost sight of Dinneny, (*id.* ¶ 34), but McInerney also saw him raise the gun, (*id.* ¶ 27).  Neilson fired shots at Dinneny at or around the same time as Berman.  (*See id.* ¶¶ 20, 34.)[5]  Dinneny was pronounced dead at the hospital at 7:51 p.m.  (ECF No. 30 ("AC") ¶¶ 27, 62-63.)

Plaintiff does not dispute that the Responding Officers repeatedly ordered Dinneny to drop the gun and Dinneny refused, (P's 56.1 Resp. ¶¶ 11, 12, 33), that Dinneny shouted to the officers that they should shoot him, (*id.* ¶¶ 12, 61), that Dinneny began to lift his right arm with the gun in the direction of the Responding Officers, (*id.* ¶¶ 9, 14),[6] and that when Dinneny began

---

[5] The events unfolded in a matter of seconds.  In the background of the 911 call, an officer can be heard shouting to Dinneny to put the gun down; Dinneny can be heard yelling, "So shoot me" ten seconds later; and shots can be heard two seconds later.  (ECF No. 117-2 (USB containing audio files).)  While it is unclear whether Dinneny was still holding the phone to his ear at the time, Booth also said to "put the gun down" several times.  (*Id.*)

[6] Plaintiff does not dispute Defendants' 56.1 statement that Dinneny "took his right hand from behind his knee and began to lift his arm into almost a forty[-]five degree angle with the gun going in the direction of [Berman] and the three other officers."  (*Id.* ¶ 14.)  Plaintiff simply adds, "McInerney testified that 'once [Dinneny] raised [his right arm], began raising it horizontally I heard multiple shots from behind me.'"  (*Id.* ¶ 14; *see id.* ¶ 27.)  In Plaintiff's Memorandum of Law, Plaintiff seemingly attempts to dispute the fact that Plaintiff began raising his arm with the gun, but provides no evidence to the contrary.  For example, Plaintiff argues that "the State Police report never stated that Mr. Dinneny raised the gun towards the Defendants," and that "[t]he report only stated that the Defendants ordered Mr. Dinneny to lower his weapon, he refused, then the Defendants shot him."  (ECF No. 114 ("P's Opp.") at 13.)  It is unclear, however, to what the Responding Officers would have been referring when they ordered Dinneny to lower his weapon if it was not raised.  Moreover, the portion of the State Police report that Plaintiff cites is a short synopsis of the "preliminary facts" of the investigation.  (ECF

4

to lift his right arm with the gun, all Defendants were within approximately twelve feet of the door of the Home where Dinneny was standing, (*id.* ¶ 15).  Plaintiff also does not dispute that Defendant Berman thought Dinneny was an immediate threat and that Berman believed he had no alternative but to stop the threat.  (*Id.* ¶ 19.)[7]  Instead, Plaintiff notes that "Dinneny was in a diminished mental and physical state, and was speaking with Lt. Booth on the phone and asking for help when the Defendants approached."  (*Id.*)[8]

### B.   Procedural History

On July 13, 2017, Plaintiff, Dinneny's daughter, filed suit against the Defendants, among others, asserting claims under the Fourth, Eighth, and Fourteenth Amendments, as well as state law claims.  (ECF No. 1 ("Complaint") ¶¶ 52-81.)  Plaintiff amended her complaint on October 17, 2017, advancing the same claims asserted in the original Complaint.  (AC.)

Defendants moved to dismiss the Amended Complaint on March 5, 2018, (ECF No. 39), and by Opinion and Order dated September 24, 2018, (ECF No. 45 ("2018 Decision")), the

---

No. 118-3 at 4.)  Plaintiff next argues that "[t]he claim that Mr. Dinneny raised his arm with the pellet gun in his hand only comes from Defendant Berman and is inconsistent with all of the other oral testimony, written reports, and forensic evidence."  (P's Opp. at 14.)  But Plaintiff cites Defendant McInenery's testimony corroborating Berman that Dinneny was raising the gun, (P's 56.1 Resp. ¶ 14); ignores Defendant Neilson's Case Supplement Report, which Plaintiff provided and which states that Dinneny "raised his right arm to approximately a forty-five degree angle, with the gun pointing towards [Neilson] and PO Berman," (ECF No. 118-1 at 2); and provides no testimony, reports or forensic evidence contradicting the officers.  The forensic evidence to which Plaintiff presumably refers is discussed below.

[7] The record contains no sworn statement from Neilson.  Plaintiff, however, provided Neilson's written report, in which he states that when Dinneny raised the gun toward him and Berman, he (Neilson) "feared that if I did not shoot he would shoot us."  (ECF No. 118-1 at 2.)

[8] The recording of the conversation between Dinneny and Booth reveals that Booth offered help to Dinneny, not that Dinneny asked for it.  Just before the shooting, Dinneny was saying, "I don't give a fuck" and "So shoot me."

Court granted the motion in part and denied it in part.  (*See* 2018 Decision at 2, 25.)  Familiarity

with that decision is presumed.  I held that the following claims survived:

> • Count I (excessive force) against Neilson, Berman, Franck, and McInerney (under the Fourth Amendment only);
> • Count VI (assault) against Neilson, Berman, Franck, and McInerney;
> • Count VII (battery) against Neilson, Berman, Franck, and McInerney; and
> • Count VIII (wrongful death) against Neilson, Berman, Franck, McInerney, and the City.

(*Id.* at 25-26.)

The AC alleged that Dinneny refused orders to drop the gun, stepped out of sight back

into the Home, and then emerged and began to raise his right hand.  (AC ¶¶ 57-58.)  In the 2018

Decision, with regard to the excessive force claim, I explained that "[a]lthough the logical

inference from the Amended Complaint is that the gun was still in Dinneny's hand when he

raised it," the AC "[did] not allege where Dinneny's gun was located when he raised his right

hand, so it [was] not clear from the face of the Amended Complaint that the gun was in his hand

or in close reach (or that the officers reasonably perceived it to be so)" when the officers shot

him.  (2018 Decision at 9.)  I further stated, "Because the location of Dinneny's gun when he

emerged from the Home the second time will be highly influential as to whether Plaintiff's

excessive force claim succeeds or fails, the Court will permit the claim to go forward."  (*Id.* at 11

(cleaned up).)  But I was clear that other theories of liability posited by Plaintiff (described

below) were not plausible, (*id.* at 11-13), and thus that "the excessive force claim will proceed

only on the theory that the force was excessive because Dinneny did not have the gun and it was

not close by," (*id.* at 13).  I cautioned that "[i]f Plaintiff cannot proceed on that theory in good

faith, she should withdraw the claim."  (*Id.* at 13; *see id.* at 11 n.5 ("If Dinneny was holding the

gun, summary judgment for the officers will almost certainly be appropriate.").)

I also noted that in Plaintiff's original Complaint, she had alleged that Dinneny "did not drop the pellet gun" when ordered to do so and that he "began to raise his right hand pointing the pellet gun" when the officers shot him, (Complaint ¶¶ 36-38), but those allegations were missing from her Amended Complaint, (2018 Decision at 9).  I further stated:

> The omissions from the Amended Complaint suggest gamesmanship at its worst, considering that (1) the omission occurred after Defendants argued in a pre-motion letter that Plaintiff could not sustain an excessive force claim because Plaintiff alleged that Dinneny "began to raise his right hand pointing the pellet gun," and (2) Plaintiff did not explain in her opposition brief why the fact changed (despite Defendants having pointed out the "curious – if not disingenuous – omission"). Plaintiff's counsel is reminded that if he is indeed omitting a key piece of undisputed factual information in order to avoid dismissal, he and his client run the risk of being sanctioned for vexatiously multiplying the litigation.

(*Id.* at 10 n.4 (first quoting ECF No. 25 at 1-2, then quoting ECF No. 34 at 4 n.2).)

Following the 2018 Decision, Defendants answered, (ECF No. 47), and the Court entered a case management plan, setting a fact discovery cutoff of April 15, 2019, and an expert discovery cutoff of June 17, 2019, (ECF No. 46).  At Defendants' request, (ECF No. 48), the discovery deadline was extended to July 31, 2019, (ECF No. 49).  That was the only extension sought by either party.

On August 7, 2019, Defendants filed a pre-motion letter, (ECF No. 57); on August 15, Plaintiff responded, (ECF No. 60); and on August 22, the Court held a pre-motion conference, (Minute Entry dated Aug. 22, 2019).  At the conference, the Court set the following briefing schedule:  Defendants' motion was due on October 4, 2019; Plaintiff's opposition was due on November 4; and Defendants' reply was due on November 24.  (*Id.*)  The Court offered the parties the opportunity to bundle – meaning that they would serve the papers on each other on the due dates, but would not electronically file the papers on the docket until the motion was fully briefed – which the parties apparently agreed to do, as they submitted all of their motion papers on November 25, 2019.  (ECF Nos. 63-79.)

Before the parties filed their motion papers on the docket, but after Plaintiff's counsel served Defendants with his opposition brief, Plaintiff's counsel filed a motion for leave to file an untimely expert report of Dr. Zhongxue Hua, a forensic pathologist and neuropathologist. (ECF No. 61.) Defendants opposed the motion, (ECF No. 75 at 20-23), and Plaintiff's counsel filed a reply affirmation, (ECF No. 80).

By Opinion and Order dated July 23, 2020, (ECF No. 81), the Court noted that while Plaintiff's counsel's explanation for failing to comply with the disclosure requirements of the Federal Rules of Civil Procedure could not have been any weaker, (*id.* at 6), and while Dr. Hua's testimony might "only invite speculation" rather than raising an issue of fact, (*id.* at 7), I would permit the belated disclosure in the interest of full factual development, (*id.* at 9). The Court extended the expert discovery deadline until October 23, 2020, but only for the limited purpose of Defendants deposing Dr. Hua and offering a rebuttal expert, and denied Defendants' motion for summary judgment without prejudice to renewal. (*Id.*) The renewed motion was fully submitted on January 25, 2021. (ECF Nos. 101-119.)

In addition to filing a Memorandum of Law, Plaintiff's counsel submitted a twenty-nine page "Declaration in Opposition," which includes a "Table of Contents" and "Table of Authorities." (ECF No. 115.) "Unlike the typical attorney affirmation, which simply attaches and identifies exhibits for the Court, counsel's affirmation consists entirely of factual assertions and legal arguments regarding Defendants' evidence." *Dejana Indus., Inc. v. Village of Manorhaven*, No. 12-CV-5140, 2015 WL 1275474, at *2 (E.D.N.Y. Mar. 18, 2015). Such a declaration is "improper and inadmissible" both because it "could not possibly be based on personal knowledge because it is based entirely on counsel's own interpretation of the evidence in the record," *id.*, and because "under Local Civil Rule 7.1, legal argument must be set forth in a

memorandum of law, not in an attorney affirmation," *id.* at 3; *see H.B. v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881, 2012 WL 4477552, at *5-6 (S.D.N.Y. Sept. 27, 2012).  I will not allow counsel to bypass the page limits on memoranda of law[9] by submitting additional argument in the form of a declaration.[10]  Accordingly, I decline to consider Mr. Meth's "Declaration in Opposition."[11]

## II.     LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

---

[9] Section 2(B)(i) of my Individual Practices limits memoranda of law to twenty-five pages absent prior permission, which Plaintiff's counsel neither sought nor obtained.

[10] Counsel for Defendants also submitted an affidavit.  (ECF No. 65.)  It did not contain legal argument but rather attached exhibits and summarized factual information contained elsewhere in the record.  (*Id.*)  Unfortunately, Defendants' 56.1 Statement in many instances cited to counsel's affidavit rather than to the underlying record, which increased the Court's work, as the Court was required to go from the 56.1 Statement to the affidavit to the record in order to confirm the information in the 56.1 Statement.  In the future counsel's 56.1 Statements should cite directly to the record.

[11] Even if I were to consider Mr. Meth's Declaration it would not make a difference to the outcome of this motion because the points he raises either are irrelevant, have been addressed in my previous decisions or will be addressed in this one.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

"[G]iven the difficult problem posed by a suit for the use of deadly force, in which the witness most likely to contradict the police officer's story – the person shot dead – is unable to testify, the court may not simply accept what may be a self-serving account by the police officer." *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (cleaned up). Instead, "the court must also consider circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.*

### B.  <u>Qualified Immunity</u>

Qualified immunity shields a government official from liability for civil damages if either (1) the "official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (*per curiam*)); or (2) "it was objectively reasonable for [the official] to believe that [his or her] actions were lawful at the time of the challenged act," *Simpson v. City of N.Y.*, 793 F.3d 259, 268 (2d Cir. 2015). "The objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (cleaned up). "The objective element of this test requires the court to look beyond the generalized constitutional protection, such as the right to be free of unreasonable searches and seizures, and to determine whether the law is clearly established in a more particularized sense," given the specific factual situation with which the officer is confronted. *Kerman v. City of N.Y.*, 261 F.3d 229, 236 (2d Cir. 2001).

Qualified immunity entitles public officials to "an immunity from suit rather than a mere defense to liability . . . . [I]t is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (cleaned up).

## III.   DISCUSSION

### A.   Federal Claim

Plaintiff asserts a Fourth Amendment excessive force claim based on the Responding Officers' alleged use of excessive force.  Defendants seeks dismissal of Plaintiff's excessive force claim on one of two grounds:  (1) the Responding Officers' use of deadly force was not excessive because Dinneny posed a significant threat; or (2) the Responding Officers are entitled to qualified immunity.  (ECF No. 109 ("Ds' Mem.") at 2-21; *see generally* ECF No. 113 ("Ds' Reply").)  Plaintiff disagrees, arguing that there are genuine issues of material fact precluding summary judgment, (P's Opp. at 2-9), and that the Responding Officers' actions were not objectively reasonable, (*id*. at 9-21).

"[C]laims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "A determination of reasonableness under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Kerman*, 261 F.3d at 239 (cleaned up).  Evaluation "of a particular use of force must be . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).  "A claim [of] excessive force . . . is subject to an objective test of reasonableness under the totality of the

circumstances, which requires consideration of the specific facts in each case, including the

severity of the crime at issue, whether the suspect posed an immediate threat to the safety of

others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d

Cir. 2000). "The calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments – in circumstances that are tense,

uncertain, and rapidly evolving – about the amount of force that is necessary in a particular

situation." *Graham*, 490 U.S. at 396-97. Furthermore, qualified immunity protects officers from

the "sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S.

194, 206 (2001) (cleaned up), *overruled in part on other grounds by Pearson v. Callahan*, 555

U.S. 223, 236-43 (2009).

It is undisputed that the officers here were responding to a serious situation – an armed

person threatening to shoot someone – and that Dinneny did not surrender to the officers, so the

Court will focus its analysis on the remaining factor:  whether he posed an immediate threat to

the safety of others.

### 1. Plaintiff's Theories of Liability

As an initial matter, Plaintiff reargues theories of liability on this motion that the Court

has already dismissed as invalid.[12]  For example, Plaintiff reargues that the Responding Officers

"did not act according to Middletown Police Policy with regard to their actions during the call

that resulted in the untimely death of Mr. Dinneny."  (P's Opp. at 10.)  I refer Plaintiff to the

---

[12] Plaintiff recognizes as much by noting, "This court previously found in its 12(b)(6) decision that 'the excessive force claim can proceed only on the theory that the force was excessive because Mr. Dinneny did not have the gun and it was not close by.'  It is respectfully submitted that this is not the standard by which the court should determine reasonableness."  (P's Opp. at 15.)  Plaintiff made no effort, however, to explain why the Court's earlier analysis, reiterated again in this opinion, was incorrect.

2018 Decision where I explained that the Responding Officers' actions leading up to the shooting are irrelevant, *see Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996) (An officer's "actions leading up to the shooting are irrelevant to the objective reasonableness of his conduct at the moment he decided to employ deadly force.  The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force."), and that violations of internal procedures do not rise to the level of a constitutional violation, *see Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (no constitutional violation where officer rushed toward apartment without backup even though such action violated department procedures and arguably increased likelihood that he might have to use force); *Salim*, 93 F.3d at 92 (declining to find officer liable for excessive force where plaintiff argued that officer violated multiple internal procedures in moments before using deadly force); *Vazquez v. City of N.Y.*, No. 10-CV-6277, 2014 WL 4388497, at *13 n.6 (S.D.N.Y. Sept. 5, 2014) ("Section 1983 'protects plaintiffs from constitutional violations, not violations of . . . departmental regulations and police practices.'") (quoting *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006)).

Plaintiff also reargues that it was not reasonable for the Responding Officers to believe that the weapon in Dinneny's hand could shoot real bullets.  (P's 56.1 Resp. ¶ 40; P's Opp. at 20.)  I again refer Plaintiff to the Court's 2018 Decision where I stated:

> [B]y Plaintiff's own admission, the pellet gun appeared to be a handgun.  (AC ¶ 55.)  Thus, it was objectively reasonable for the Responding Officers to treat the gun in Plaintiff's hand as if it were a handgun.  A reasonable officer is not expected to be able to tell the difference between a handgun and a pellet gun that appears to be a handgun.

14

(2018 Decision at 12.)[13]  Moreover, the photographs of the pellet gun, which show that the weapon looks like a handgun and has a removable magazine, further dispel any argument that the Responding Officers should have recognized it as a pellet gun rather than a handgun.  (ECF No. 107 ¶ 2; ECF No. 107-1 at 1-3.)

In the Court's 2018 Decision, I was clear that "the excessive force claim will proceed only on the theory that the force was excessive because Dinneny did not have the gun and it was not close by."  (2018 Decision at 13.)  I was also clear that "[i]f Plaintiff cannot proceed on that theory in good faith, she should withdraw the claim," (*id.*), and that "[i]f Dinneny was holding the gun, summary judgment for the officers will almost certainly be appropriate," (*id.* at 11 n.5).  Plaintiff presents no facts disputing Defendants' showing that Dinneny was not only holding the gun and refusing to drop it, but was raising it toward the Responding Officers.  Not only are Defendants' statements consistent on that point, (ECF No. 104-1 at 1-2; ECF No. 117-4 at 46:2-7; ECF No. 105-1 at 2; ECF No. 103-8 at 14,[14] 15; ECF No. 111-1 at 1), but Plaintiff has not disputed Defendants' 56.1 Statement that Dinneny was raising the gun in the direction of the officers, (*see* P's 56.1 Resp. ¶ 14), and she herself said as much in her original Complaint,

---

[13] In arguing that plaintiffs sometimes recover despite their decedents being armed, Plaintiff refers, without citation, to cases with different facts.  Plaintiff argues that in "the case of [twelve-year-old] Tamir Rice, . . . [t]he 911 caller stated that the handgun was probably fake, but that was in [*sic*] dispatched to the defendant officers."  (P's Opp. at 15-16.)  It is not even clear from Plaintiff's argument whether the officers in that case knew or had reason to know that the handgun was fake, nor does Plaintiff suggest that the gun was being wielded in any fashion that threatened the officers.  In any event, that case settled with no admission of wrongdoing, *see* Order, *Winston v. City of Cleveland*, No. 14-CV-2670, (N.D. Ohio Apr. 25, 2016), ECF No. 128, so it is difficult to see what precedential value it could have.  Plaintiff also refers to the case of Laquan McDonald, which apparently also settled and which involved a decedent, who refused to drop a knife, being shot as he was walking away from the officer.  (P's Opp. at 16.)  Neither case involved a decedent raising what appeared to be a real gun toward the officers.

[14] Cites to nonconsecutively paginated docket materials refer to the page numbers generated by the Court's Electronic Case Filing ("ECF") System.

(Complaint ¶ 38).[15]  Against this wall of evidence, no reasonable jury could find that the officers acted unreasonably in responding with deadly force to this threat of deadly force.  *See Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) ("[A]n officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.") (cleaned up); *Pape v. City of Stamford*, No. 17-CV-863, 2018 WL 6250135, at *2 (D. Conn. Nov. 29, 2018) (noting "apparent threat of deadly force presented by [Plaintiff's decedent] when he aimed his gun in the direction of the officers"); *Diggs v. N.Y. Police Dep't*, No. 04-CV-1849, 2005 WL 3533158, at *4 (E.D.N.Y. Dec. 22, 2005) ("If a suspect threatens an officer with a weapon, the officer may use deadly force in response."); *Davidson v. City of Opelika*, 675 F. App'x 955, 959 (11th Cir. 2017) (*per curiam*) (on summary judgment, observing that "the unusual position of the dark object in [the plaintiff]'s outstretched and clasped hands would have led a reasonable officer to believe that [the plaintiff] was pointing a gun at him"); *Kenning v. Carli*, 648 F. App'x 763, 764-70 (11th Cir. 2016) (police officers reasonably used deadly force where resident opened door with a gun and initially complied with officers' commands to drop the gun, but subsequently refused to get on the ground, turned towards the door, and reached for the gun).

Plaintiff seemingly conflates "criminal intent" with "immediate threat" by arguing that "there is no evidence [i]n the record that [Dinneny] had any criminal intent by his actions."  (P's

---

[15] While Plaintiff's admission in the original Complaint ceased to be "a conclusive judicial admission" once it was superseded by the AC, it "remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extra-judicial admission made by a party or his agent."  *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) (cleaned up).

Opp. at 11.)  Plaintiff further asserts that the Responding Officers "had actual notice of Mr.

Dinneny's mental status, intoxication . . . and suicidal idealizations [*sic*]." (*Id*.)  But Dinneny's

criminal intent (or lack thereof), mental status, intoxication, and suicidal ideation are irrelevant,

given that Dinneny posed an immediate threat in the seconds leading up to the shooting by

raising the gun toward the Responding Officers.  *See Phillips v. James*, 422 F.3d 1075, 1084

(10th Cir. 2005) ("There [i]s no reason for [an officer] to have to wait to be shot at or even to see

[an individual] raise a gun and point it at [the officer] before it would be reasonable for [the

officer] . . . to shoot [the individual].");  *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255,

1260 (10th Cir. 2008) ("A reasonable officer need not await the 'glint of steel' before taking self-

protective action; by then, it is often too late to take safety precautions.") (cleaned up); *Est. of

Jackson v. City of Rochester*, 705 F. Supp. 779, 784 (W.D.N.Y. 1989) ("The super-cop of

television and movies who disarms felons in hand-to-hand combat or with a well-placed shot to

the hand should not be the standard by which we determine whether there has been a violation of

a citizen's constitutional rights.").  As Defendants put it, "if an armed person threatens to shoot

people, refuses to drop his weapon, and raises the gun toward the police, it simply does not

matter if he is drunk, drugged or suicidal:  his actions threatened immediate death or serious

injury to the police officers."  (Ds' Reply at 8 n.8.)

## 2.    Experts

Plaintiff argues that "there is a genuine issue of material fact regarding which position . . .

Dinneny was in and which way he was facing when he was shot."  (P's Opp. at 6.)  Plaintiff also

takes issue with Defendants' expert's statement that Dinneny was "swinging" his pellet gun

towards Defendants Franck and McInerney because "not one of the Defendants stated in any

reports, affidavits, or depositions that . . . Dinneny swung the pellet gun in their direction."  (*Id*.)

First, with respect to which way Dinneny was facing when he was shot, Plaintiff provides no evidence from which a reasonable jury could infer that Dinneny was facing away from the officers or otherwise not raising his gun in their direction.  (*E.g.,* ECF No. 104-1 at 1-2; ECF No. 117-4 at 46:2-7; ECF No. 105-1 at 2; ECF No. 103-8 at 14, 15; ECF No. 111-1 at 1; *see* P's 56.1 Resp. ¶ 14.)  Second, the Court agrees with Defendants that it "is not even close to a material dispute" that the Responding Officers did not use the word "swinging" to describe Dinneny's position, because "[w]hether a hostile aggressor – who is refusing commands to drop his weapon – is *raising* or *swinging* his arm with a loaded gun in your even general direction does not change the fact that you may be shot in one or two seconds."  (Ds' Reply at 7 (emphasis in original).)  Defendants' expert's characterization of Dinneny as "swinging" his arm is not inconsistent with the officers' accounts, and in any event the Court does not rely on Defendants' expert in evaluating the evidence on this motion.

The closest Plaintiff comes to creating a fact issue is through Dr. Hua's expert report and testimony.  In his report, Dr. Hua notes that "at the moment of [Dinneny's] right wrist gunshot wound," – one of three wounds suffered by Dinneny[16] – his "right volar wrist was directly facing the police officer(s), *i.e.*, [Dinneny's] right hand, which was holding a BB gun, should not, would not, and could not be in an implied shooting position."  (ECF No. 118-7 at 2.)  Importantly, the issue here is not whether Dinneny was in an "implied shooting position," but whether Dinneny posed an immediate threat to the Responding Officers.  *See Sullivan*, 225 F.3d at 165.  Put another way, assuming that Dinneny was not in an "implied shooting position," that fact is immaterial because he could have been in such a position within a second or could have

_____

[16] According to the autopsy report, Dinneny was hit in the left chest and right wrist, and his left hip was grazed.  (ECF No. 103-3 at 3.)

been an immediate threat to the officers without being in such a position.  *See Phillips*, 422 F.3d at 1084 ("There [i]s no reason for [an officer] to have to wait to be shot at or even to see [an individual] raise a gun and point it at [the officer] before it would be reasonable for [the officer] . . . to shoot [the individual].").

Additionally, Dr. Hua's testimony that it was "extremely unlikely" that Dinneny's gun was pointed in the direction of "whoever fired the rifle" at the moment the rifle shot hit his wrist, (ECF No. 103-4 at 16:9-11), does not mean that Dinneny was not raising his arm with the gun or that he was not pointing the gun in the direction of the other Responding Officers.  In fact, when asked if "the gun could have been pointed in the direction of the other police officers," Dr. Hua replied, "I was not there" and "I do not know."  (*Id.* at 12:22-13:9.)

Dr. Hua's testimony at most suggests that Dinneny's gun was not pointing at Berman, who wielded the rifle, (ECF No. 104-1 at 1-2),"[a]t the moment that [Dinneny] suffered the right wrist shot," (ECF No. 103-4 at 11:19-12:2).[17]  But where Dinneny's gun was pointing when he was shot in the wrist would only arguably contradict Defendant Berman's testimony that the gun was pointing toward him *if* Dinneny was shot in the wrist before he was shot in the chest – a proposition for which Plaintiff provides no evidence.  As Defendants argue, "[i]f Dinneny was struck in the chest first, and this caused him to fall or 'fly back' as has been indicated in this record, the positioning of his gun arm could have changed in a split second, thus giving Hua his reading on the position of the wrist.  Put another way, the position of the wrist could have

---

[17] It may be reasonable to infer, if the volar (under) side of Dinneny's right wrist was perpendicular to the ground at the time it was hit, that Dinneny was not at that moment aiming the weapon in front of him.  But that provides no basis to infer that he had not been raising it in front of him just before that moment.

changed instantaneously upon the initial bullets striking the body." (Ds' Mem. at 11.)[18]  And Dr.

Hua admits that he does not know the sequence of the shots, which bullet struck Dinneny first, or

which area of Dinneny's body was struck first. (ECF No. 103-4 at 17:2-18:11, 21:24-22:8.)  For

a jury to conclude that the angle of the wrist wound means that Dinneny was not raising the gun

in the direction of the officers when they opened fire would be sheer speculation. *See Zinck v.*

*ITT Corp.*, 690 F. Supp. 1331, 1339 n.9 (S.D.N.Y. 1988) ("To allow the question . . . to go the

jury with such slight factual basis would be simply to invite jury speculation.  Summary

judgment is therefore appropriate.") (cleaned up); *see generally Major League Baseball*

*Properties, Inc.*, 542 F.3d at 310 (conjecture or speculation cannot defeat summary judgment).

　　　In short, Dr. Hua's testimony and report amount to a "scintilla of evidence," *Anderson*,

477 U.S. at 252, and "do not create material disputes of fact as to whether the officers' initial

decision to use deadly force was reasonable," *Est. of Jaquez by Pub. Adm'r of Bronx Cnty. v.*

*City of N.Y.*, 706 F. App'x 709, 714-15 (2d Cir. 2017) (summary order) ("Appellants' assertions

that (1) the downward trajectory of bullets demonstrated that Jaquez was lying on the ground, (2)

the trajectory of the bullets reflects that Jaquez's right arm was pulled back and not advancing at

the officers, and (3) Jaquez . . . could not have reached [the officer's] neck with the knife do not

create material disputes of fact as to whether the officers' initial decision to use deadly force was

reasonable," in light of "Jaquez's refusal to follow commands, his close proximity to a lethal

weapon, and his behavior up to that point"); *id.* ("the limited circumstantial evidence indicating

---

[18] Dr. Hua's testimony even supports this argument:  Dr. Hua testified that he "would expect" the position of Dinneny's wrist "to change" if the first bullet struck Dinneny in the chest, (ECF No. 103-4 at 21:24-22:8), and when asked what direction Dinneny's body was moving at the time the first bullet struck him, he responded, "The first bullet struck his wrist would be inconsistent with the autopsy finding as well as Mr. Berman's statement," (*id.* at 25:11-14).

the possible positions of the officers and Jaquez at the time that they initially fired live ammunition is insufficient to defeat summary judgment on qualified immunity.").

### 3.    Alleged Contradictions

Plaintiff argues, "there is too much circumstantial and contradictory evidence to allow summary judgment."  (P's Opp. at 3.)  But Defendants argue – and the Court agrees – that most of the "claimed inconsistencies are misstatements," some are "fact-twisting or silly violations of common sense," and "[a]bsolutely none are *material* on this motion."  (Ds' Reply at 15 (emphasis in original).)

For example, Plaintiff argues that there is an inconsistency between Defendant Berman's testimony that he was unaware that anyone was on the phone with Dinneny and the 911 dispatcher's testimony that she radioed, "Cars be advised the desk is on the phone with one party."  (P's Opp. at 3.)  But whether or not Defendant Berman heard the dispatch or knew Dinneny was on the phone is not material to whether Dinneny was an immediate threat when he raised the gun and pointed it at the Responding Officers.

Plaintiff next argues that Defendant Berman's testimony that he "was the first officer to arrive" and that he "went straight to Mr. Dinneny's front door followed by Defendants Franck and McInerney" is somehow contradicted by Defendant McInerney's testimony that the officers "got together as a collective group . . . and made [their] way towards [the Home]."  (P's Opp. at 3-4.)  Plaintiff also claims that Berman testified that "he was the first on scene and approached the door before the other officers arrived."  (*Id.* at 14.)  For both propositions Plaintiff's counsel cites a page of Berman's deposition that says nothing of the sort.  (*See* ECF No. 117-4 at 8.)  To the contrary, Berman testified that once he located the home, he waited fifteen to twenty feet away until other officers arrived, and that he, Franck and McInerney approached the Home

together.  (*Id.* at 12:11-18, 14:12-15:10.)  The cited testimony is not contradictory, but even if it were, it is immaterial to whether Dinneny was an immediate threat when he was shot.

The Court similarly does not find an inconsistency or contradiction between McInerney's supposed testimony that some of the Responding Officers evacuated occupants of nearby residences and businesses in the area at an unspecified time,[19] and Berman's testimony that he did not hear any neighbors outside when he arrived.  (ECF No. 117-4 at 10:4-7; *see* P's Opp. at 4.)  Nor would issues regarding how and whether the Responding Officers secured the scene and protected uninvolved citizens in the area before or after the shooting be material.

Likewise, that Defendant Berman testified that Dinneny still had the gun in his hand after he was shot, and so Berman shot again, (ECF No. 117-4 at 46:9-25), can logically coexist with Defendant Neilson's statement that he saw Dinneny's "gun fly out of his hand . . . and observed him fly back and fall to the ground," (ECF No. 118-1 at 2; ECF No. 111-1 at 1).  There is no reason to assume the two officers were referring to the same moment.  Moreover, "[t]he interest in ending that threat justified both [Berman's] first and second shots." *Peguero v. City of N.Y.*, No. 12-CV-5184, 2015 WL 1208353, at *8 (S.D.N.Y. Mar. 17, 2015).  "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (finding fifteen shots in ten-second span to be reasonable); *see McKoy v. District of Columbia*, No. 18-CV-416, 2021 WL 270397, at *7 (D.D.C. Jan. 27, 2021) ("In firing multiple shots at Williams, Officer Brathwaite reacted to his reasonable perception of a rapidly developing and potentially deadly situation by acting to protect himself and Officer Bacon.");

---

[19] To support this testimony, Plaintiff cites a non-existent exhibit.  (*See* P's Opp. at 4 (citing Exhibit H).)

*Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015) (collecting cases for proposition that qualified immunity is appropriate when officer fires several shots within seconds of perception of threat, even if perpetrator relinquished control of weapon during those seconds); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("A police officer is entitled to continue his use of force until a suspect thought to be armed is fully secured.") (cleaned up).

Plaintiff attempts to create a dispute of fact by arguing that the evidence does not "support the claim that Mr. Dinneny charged at the Defendants." (P's Opp. at 13.) But Defendants do not argue that Dinneny charged at them. (*See* Ds' Reply at 12.) And regardless, whether Dinneny "charged" at the Responding Officers does not change the fact that Dinneny posed an immediate threat when he pointed the gun in their direction. How far Dinneny initially opened the door, whether he stepped forward or back as he raised the gun, and when the gun finally left his hand, (*see* P's Opp. at 4-5, 14-15), are all likewise immaterial to whether Dinneny posed an immediate threat to the officers. Minor inconsistencies on inconsequential issues are to be expected, and do not suffice to defeat summary judgment. *See Banks v. Cuprill*, No. 96-CV-9542, 1997 WL 260031, at *2 (2d Cir. 1997) (unpublished table decision) ("The minor inconsistencies [Plaintiff] notes in [Defendant's] various accounts of his conduct after the fact are not sufficient to overcome the undisputed good faith basis that existed for the detention and search."); *Keyes v. City of N.Y.*, No. 18-CV-4712, 2021 WL 3773477, at *4 (S.D.N.Y. Aug. 24, 2021) ("[T]hese are minor inconsistencies, none of which pertains to whether Defendants were close enough to observe [Plaintiff] and believe, mistakenly or not, that he had touched Alleged Victims 1 and 2. In other words, [Plaintiff] fails to identify a genuine dispute as to any *material* fact regarding the presence or absence of probable cause to arrest him.") (emphasis in original); *Hewitt v. City of N.Y.*, No. 09-CV-214, 2012 WL 4503277, at *1 (E.D.N.Y. Sept. 28, 2012)

("Apparent inconsistencies and minor discrepancies, however, do not meaningfully diminish the strength of the evidence available to the defendant officers at the time of plaintiff's arrest and prosecution."), *aff'd*, 544 F. App'x 24 (2d Cir. 2013).

For the reasons stated above, the Responding Officers acted reasonably in using deadly force in the situation they faced.  At the very least, they are entitled to qualified immunity, as it cannot be said that every reasonable officer would disagree with their belief that using deadly force in that situation was necessary and would not violate Dinneny's rights.  *See Elias v. Village of Spring Valley*, 81 F. Supp. 3d 312, 322 n.77 (S.D.N.Y. 2015); *Est. of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 433 (S.D.N.Y. 2015), *aff'd sub nom. Est. of Jaquez by Pub. Adm'r of Bronx Cnty. v. City of N.Y.*, 706 F. App'x 709 (2d Cir. 2017).  Accordingly, summary judgment is granted on Plaintiff's excessive force claim.

**B.    State Law Claims**[20]

Defendants argue that Plaintiff's state law claims for assault and battery must be dismissed.  (Ds' Mem. at 21.)  The Court agrees.  Because "[a]ssault and battery claims under New York law and Fourth Amendment excessive force claims are evaluated pursuant to the same

---

[20] "Because plaintiff's federal and state claims are so closely intertwined, both legally and factually," *Casiano v. Ashley*, 515 F. Supp. 3d 19, 28 (W.D.N.Y. 2021), and having considered the factors set forth in *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006), I exercise my discretion to exercise supplemental jurisdiction over the state law claims, as doing so will further judicial economy and convenience to the parties, and because the state law claims present no unusual or unsettled principles of state law.  *See Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 83 (2d Cir. 2018) ("[W]e have upheld the exercise of supplemental jurisdiction even when all federal-law claims were eliminated prior to trial, for example, in long-pending cases presenting no novel issues of state law where discovery had been completed, dispositive motions had been submitted, and the case would soon be ready for trial.") (cleaned up).

standard," *Cosby v. City of White Plains*, No. 04-CV-5829, 2007 WL 853203, at *6 (S.D.N.Y. Feb. 9, 2007); *see Kavazanjian v. Rice*, No. 03-CV-1923, 2008 WL 5340988, at *7 (E.D.N.Y. Dec. 22, 2008) ("The test for whether a plaintiff can maintain [state law assault and battery] cause[s] of action against law enforcement officials is the exact same test as the one used to analyze a Fourth Amendment excessive force claim.") (cleaned up), "to the extent that the Court has granted Defendants summary judgment on [Plaintiff's] federal excessive force claim, Defendants are entitled to summary judgment on [Plaintiff's] state law claim[s] for assault and battery," *Cruz v. City of New Rochelle*, No. 13-CV-7432, 2017 WL 1402122, at *29 (S.D.N.Y. Apr. 3, 2017).

Summary judgment is also warranted on Plaintiff's wrongful death claim.  Because the Court has already dismissed Plaintiff's negligence cause of action and now dismisses Plaintiff's claims for excessive force, assault, and battery, Plaintiff's claim for wrongful death must be dismissed.  *See Cruz*, 2017 WL 1402122, at *30 (where Defendant "has been granted summary judgment on Plaintiffs' federal claim for excessive force and state law claim for assault and battery, Plaintiffs' claim for wrongful death must likewise be dismissed since they cannot establish a wrongful act, neglect or default to support the claim.") (cleaned up); *Est. of Jaquez*, 104 F. Supp. 3d at 440 ("As the state law assault and battery claim has no merit . . . plaintiff is unable to show a triable issue on the second prong of a 'wrongful act, neglect or default' and the wrongful death claim must therefore be dismissed.").

IV.   **CONCLUSION**

For the foregoing reasons, Defendants' second motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF

No. 101), enter judgment for Defendants, and close the case.  Plaintiff's counsel is ordered to provide a copy of this Opinion and Order to Plaintiff.

**SO ORDERED.**

Dated: September 29, 2021
    White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.